IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| IN RE: | : | Chapter 11 |
| | : | |
| SAMSON RESOURCES CORPORATION, *et al.*, | : | Case No. 15-11934-BLS |
| | : | |
| Reorganized Debtors. | : | (Jointly Administered) |
| | : | |
| CALVIN WILLIAMS, | : | |
| | : | Civ. No. 18-84-RGA |
| Appellant, | : | |
| v. | : | |
| | : | |
| SAMSON RESOURCES CORPORATION, *et al.*, | : | |
| | : | |
| Appellees. | : | |

## MEMORANDUM

Pending before this Court is appellant Calvin Williams' *pro se* appeal from a December 13, 2017 Order (B.D.I. 2956) ("Claim Objection Order")[1] entered by the United States Bankruptcy Court for the District of Delaware (the "Bankruptcy Court"), which sustained the above-captioned debtors' objection to Appellant's proof of claim. For the reasons set forth below, the Settlement Trust's motion for leave to intervene (D.I. 14) ("Motion to Intervene") is granted[2] and the Claim Objection Order is affirmed.

---

[1] The docket of the chapter 11 cases, captioned *In re Samson Resources Corp., et al.*, Case No. 15-11934-BLS (Bankr. D. Del.), is cited herein as "B.D.I. __." The Appendix to Appellee's Brief, D.I. 21, is cited herein as "SA__."

[2] The Settlement Trust was created pursuant to Debtors' confirmed plan of reorganization (B.D.I. 2019) ("Plan"). The Plan granted the Settlement Trust sole authority to file, withdraw, or litigate to judgment any objections to general unsecured claims asserted against the Debtors. The Settlement Trust is responsible for making distributions to holders of allowed general unsecured claims in accordance with the Plan, as well as liquidating, monetizing, and pursuing the causes of action for the benefit of holders of allowed general unsecured claims. On February 9, 2018, the Settlement Trust filed its Motion to Intervene in this appeal. (D.I. 14). The Motion to Intervene meets the requirements set forth in Federal Rule of Bankruptcy Procedure 8013(g). Among other things, the Settlement Trust has a strong interest regarding the issues of whether Appellant's claim

1. **Background.** Samson Resources Corporation and certain affiliates ("Debtors") operate in the oil and gas industry. In September of 2015, Debtors filed voluntary petitions for relief under Chapter 11 of the Bankruptcy Code. In early 2017, the Bankruptcy Court confirmed the Plan, and the Debtors emerged from bankruptcy as reorganized entities. (B.D.I. 2070).

2. ***The Lease***. The following facts appear uncontested. Appellant's royalties arise from a lease, executed in 1949 by Will Seamster (as amended, "Lease"), which granted Leroy Connell exclusive mineral rights to the land described as the "Northeast Quarter of Northwest Quarter (NE ¼ of NW ¼), Section 35, Township 18 North, Range 9 West" in Webster Parish, Louisiana (the "Seamster Tract"). The Lease provides that Will Seamster "grants, leases and lets exclusively unto lessee for the purpose of investigating, exploring, prospecting, drilling and mining for and producing oil, gas and all other minerals." In return for the mineral rights, the Lease provides that Will Seamster will be paid a one-eighth (1/8) royalty of all oil and gas produced from the wells, in addition to an initial payment of $1,000. The Lease was amended on May 21, 1951 to provide that drilling on any land unit with which the Seamster Tract was pooled would be sufficient to satisfy the ten-year prescriptive period for developing the mineral rights for the entire Seamster Tract, and not just the portion that was pooled. The pooling arrangement was subsequently amended, as reflected in the Amended Division Order, dated April 18, 1977.

3. Will Seamster owned a portion (159/160, or approximately 99.4%) of the 40-acre tract covered by the Lease, and that tract is only one-sixteenth (1/16) part of the 640 acres covered by the Stewart 35 Unit with which his land is pooled. Because of this, his 1/8 royalty interest must

---

constitutes an allowed general unsecured claim, and the Settlement Trust actively participated in litigation of these issues before the Bankruptcy Court. Appellant's various responses to the Motion to Intervene fail to address any of statute's legal requirements or any of the legal arguments made in support of the relief requested. (*See* D.I. 8, 16, 18). The Courts finds the relief requested in the Motion to Intervene is appropriate under the circumstances of this case and it is hereby granted.

be reduced by multiplying it by 159/160 and then by 1/16. This results in a .0077637 fractional royalty interest held by Will Seamster. Will Seamster had five children, including Beatrice Seamster Williams. Beatrice Williams, inherited one-fifth (1/5) of Will Seamster's royalty interest or .00155274 royalty interest in the Seamster Tract. Beatrice Williams had six children, including Willie Willams, each of whom inherited one-sixth (1/6) of Beatrice's royalty interest or .00025879 royalty interest in the Seamster Tract. Willie Williams had ten children, including Appellant. Two of Willie Williams' children predeceased Willie with no descendants, and therefore, in accordance with applicable law, Willie Williams' interest was divided into eighths and not tenths. Appellant has a one-eighth (1/8) interest of Willie Williams' royalty interest, or .00003235 royalty interest in the Seamster Tract.[3]

4. The Williams Heirs[4] own royalty interests in connection with nine wells (the "Wells") located in Webster Parish in which the Debtors owned interests, including, in some instances, the operating interests. All of the Wells are primarily gas-producing wells. However, the operating Wells also produce oil which is called "condensate" and is collected by Samson. Samson acquired the Lease in 2003. (SA849 at 61:19-21; SA813 at 25:16-20).

5. ***The Sale Order.*** As part of their reorganization, Debtors pursued various asset sales, and, on January 29, 2016, filed a motion seeking authority to sell certain assets (B.D.I. 621) ("Sale Motion"), including the Debtors' working interests in certain oil and gas leases. Appellant filed various pleadings objecting to the Sale Motion. (*See* SA5-23 (B.D.I. 665) (objection to Sale Motion through attached letter asserting Lease was obtained by fraud, was illegally amended in

---

[3] A full description of the heirship and calculation of Appellant's Owner Decimal of 0.00003235 (647/20,000,000) is set out at SA602-06.

[4] An illustration of the Williams Heirs' family tree can be found at SA603. As the Bankruptcy Court noted in the Claim Objection Order, this heirship was not challenged at trial by the Williams Heirs. (*See* B.D.I. 2956 at n. 12).

3

1951 and again in 1972 and was obtained from a party under disability); SA24-47 (B.D.I. 770) (asserting that Lease was not held by timely production of minerals); SA454-74 (B.D.I. 832) (asserting same)). Appellant argued that because the Lease was invalid, the Debtors could not sell their interest in the Lease. (*Id.*)

6. On June 7, 2016, the Bankruptcy Court held an evidentiary hearing on the Sale Motion and heard evidence and argument from the Williams Heirs in support of their claims. (SA480-550). Appellant made various arguments, focusing on his belief that royalty payments were not properly made (*see id.* at 44:24-45:3) and that the Lease was invalid because it had expired by its own terms (41:18-44:19; 50:19-51:12). Debtors presented evidence and testimony setting forth, *inter alia*, the difference between the Debtors' working interest in the assets and Appellant's royalty interest in the assets;[5] the continued validity of the Lease and the Debtors' ownership of a working interest thereunder; evidence showing that drilling sufficient to hold the Lease by production had occurred within ten years after entry into the Lease (*see* SA93-97 (showing "spud" dates of 1951, 1953, 1955)); and the fact that the proposed sale did not include Appellant's royalty interest. (*See id.* 15:22-41:3). The Debtors further argued that, even if that were not the case, Appellant's challenge to the Lease could not be sustained because the relevant prescriptive period[6] under Louisiana law had long since passed, and Appellant and his predecessor in interest had accepted payments arising from the Lease. (*Id.* at SA58-60).

---

[5] Debtors' witness testified generally that a typical oil and gas lease creates and governs separate interests in the wells. (*See* SA496-97 at 17:14-18:10). Generally speaking, the owner of the "working interest" has the right to come onto the property to drill and operate the well. The owner of the "royalty interest" is the mineral owner who receives a portion of the revenue generated by oil and gas produced by the well. (*See id.*)

[6] "In Louisiana, claims for royalty underpayment are subject to a three-year liberative prescription (effectively a statute of limitations) that 'commences to run from the day payment is exigible.'" *Frey v. Amoco Prod. Co.*, 943 F.2d 578, 586 (5th Cir. 1991) (*quoting* LA. CIV. CODE ANN. arts. 3494(5), 3495 (West Supp.1991)), *opinion withdrawn in part on reh'g*, 951 F.2d 67 (5th Cir. 1992), *certified question accepted*, 592 So. 2d 1308 (La. 1992), *and certified question answered*,

4

7. Following argument, the Bankruptcy Court ruled from the bench. (SA539-46 at 60:4-67:4). As the Bankruptcy Court explained, "[W]hat's in front of me today is whether or not the Debtors can sell their alleged working interest in the Seamster tract to a third party. What's not in front of me today is anything to do with the royalty payments . . . The royalty issue and who owns the working interests are two separate things." (*Id.* at 60:7-60:20). The Bankruptcy Court determined, based on the facts and evidence presented, that "there is a valid lease," that "[t]he lease was entered in 1949, production began prior to 1959 and continues to today," and that "the Debtor has the ability to sell that working interest." (*Id.* at 65:9-65:12).[7] The next day, the Bankruptcy Court entered the Order overruling Appellant's objection and approving Debtors' Sale Motion with respect to the assets. (B.D.I. 1024) ("Sale Order").

8. On July 11, 2016, Appellant filed a *Motion to Present New Evidence* (B.D.I. 1154) ("First Reconsideration Motion"). The Bankruptcy Court treated this as a motion for reconsideration under Federal Rule of Civil Procedure 59, held a hearing on September 7, 2016, and denied the First Reconsideration Motion the same day. (B.D.I. 1325). On September 15, 2016, Appellant filed a *Motion to Alter or Amend the Judgment Pursuant to Fed. R. Civ. P. 59(e)*

---

603 So. 2d 166 (La. 1992), *and opinion reinstated in part on reh'g*, 976 F.2d 242 (5th Cir. 1992). *See also Louisiana Land & Expl. Co. v. Pennzoil Expl. & Prod. Co.*, 962 F. Supp. 908, 921 (E.D. La. 1997) ("[T]here is a three year prescriptive period in which to contest royalty miscalculations").

[7] The Bankruptcy Court also set forth alternative bases for overruling Appellant's objection to the sale. "In the alternative, the Court could find . . . the fact that the beneficiaries of the Seamster lease received and continue to receive royalty payments prior to 1959 and have continued to receive them to this day, that under Louisiana law, that constitutes sufficient evidence that there's a valid lease. (SA544 at 65:13-65:19). "That is not my primary ruling. My primary ruling is factual in nature. My secondary ruling, only to the extent my primary ruling is wrong, would reach the same result. Those checks have been received, they've been cashed; as a legal matter that's sufficient to establish the lease." (*Id.* at 65:20-65:25). The Bankruptcy Court also observed that the relevant statute of limitations provided a third basis for overruling Appellant's objection to the sale. (SA545 at 66:1-66:20).

5

*to Prevent Manifest Injustice* (B.D.I. 1355), and subsequently filed a revised version on October 5, 2016 (B.D.I. 1446) ("Second Reconsideration Motion"). The Bankruptcy Court held another hearing to consider the Second Reconsideration Motion on November 16, 2016, and again denied Appellant's request for relief by order entered the same day. (Civ. No. 16-1124-RGA at D.I. 22, 11/16/16 Hr'g Tr. at 56:19-58:20; B.D.I. 1663).

9. ***Appeal of Sale Order.*** On December 5, 2016, Appellant filed his Notice of Appeal of the Sale Order. (B.D.I. 1719). On August 30, 2017, this Court dismissed Appellant's appeal of the Sale Order as untimely. (*See Williams v. Samson Resources Corp.*, Civ. No. 16-1124-RGA (D. Del. Aug. 30, 2017) at D.I. 60, 61). Appellant appealed that decision to the Court of Appeals. (*Id.* at D.I. 69). On April 12, 2018, the Third Circuit affirmed the dismissal. (*Id.* at D.I. 83-1). On May 15, 2018, Appellant's petition for rehearing en banc was denied by the Third Circuit. Appellant filed a Petition for Writ of Certiorari with the United States Supreme Court on June 8, 2018, which remains pending at No. 18-5661.

10. ***The Claim.*** Appellant filed a proof of claim (Claim No. 732) ("Claim") against Samson in the Chapter 11 cases. Appellant's Claim asserted that Samson owed him an undetermined amount for fraud, theft, and misappropriation of funds. (*See* SA1-4)). The Claim did not include any supporting documentation. (*See id.*)

11. ***Claim Objection Order.*** Following the Bankruptcy Court's entry of the Sale Order, on May 5, 2017, Debtors filed the Claim Objection. (SA551-67). The Claim Objection asserted that the Debtors' books and records reflected no liability to Appellant and that Appellant failed to provide the requisite documentation to support his claim. (SA565-67). Appellant filed a response on May 12, 2017 (SA568-73) and an additional response on July 24, 2017 (SA592-95). Appellant again asserted that certain grants of interest in mineral servitudes on the Seamster Tract that were created prior to the Lease (the "Pre-Lease Grants") expired by operation of law.

(SA570-72; SA592). Appellant further asserted that the Pre-Lease Grants had not been extended under Louisiana law. (*Id.*) In addition, Appellant asserted that the Lease "that assigns to me a 1/8 share of all oil and gas and it also expired under its own terms absent sufficient drilling and operations" was amended in 1951 to exclude interests in oil. (SA571). Appellant claimed that the Debtors had not produced a payment history for the initial lessee, and also claimed that the first well was not drilled on the property until 1971. (SA572). Appellant further asserted that the Pre-Lease Grants somehow relate to the Debtors' interest in the Seamster Tract and resulted in an unjust enrichment. (SA592).

12. On August 7, 2017, the Debtors filed a reply and declaration in support of the Claim Objection. (*See* SA596-777; SA778-97 ("Johnson Declaration")). Debtors argued that Appellant's challenge to the validity of the Lease was *res judicata* as it already had been fully presented and ruled upon the by Bankruptcy Court. (SA599). Even if the Bankruptcy Court's previous opinion did not have preclusive effect, Debtors submitted several independent bases to conclude that the prescriptive period barred any challenge to the Lease. (SA609). Debtors submitted evidence demonstrating Appellant had accepted benefits under that contract and therefore could not challenge the Lease. (SA609-10). Debtors also submitted evidence supporting their thorough review of the relevant documents, calculations of Appellant's royalty interest, and full payment to Appellant for that interest. (SA601-614; *see also* SA781-86).

13. On August 10, 2017, the Bankruptcy Court held an evidentiary hearing to consider the Claim Objection. (SA798-854). The Bankruptcy Court indicated that the issue before it was not whether the parties had a valid lease, but instead "royalties and whether they've been paid and whether they've been received and whether they were appropriate." (*See* SA805 at 17:18-20). Appellant agreed that the issue before the Bankruptcy Court was the payment of royalties. (*Id.* at 17:22-25). At the hearing the Debtors introduced Exhibits A through N of their supplemental

7

response and the Johnson Declaration, which were each admitted without objection. (SA802 at 14:4-22; SA615-777 at Exhs. A-N). Additionally, Ms. Johnson, a Division Order Analyst with 27 years of experience in the oil and gas industry, testified at the hearing in support of the Claim Objection. (SA809-10 at 21:2-22:16). Ms. Johnson testified that the Lease granted a 1/8 mineral royalty to Will Seamster, that a 1/8 mineral royalty was the standard interest granted to land owners through the 1990s, and that none of the terms of the Lease were out of the ordinary. (SA811-12 at 23:5-24:18). She further testified that no division orders had altered the rights of royalty holders under the Lease to receive payment for all oil, gas, or other hydrocarbons extracted under the Lease. (SA820 at 32:11-15; SA822 at 34:22-25; SA823 at 35:10-17). She also testified that she had confirmed Appellant's "Owner Decimal" (that is, the royalty percentage of gas, oil and other mineral proceeds that Appellant had a right to receive under the Lease) after accounting for the other persons that had inherited interests in the Lease. (SA816-17 at 28:20-29:4; SA825-26 at 37:16-38:25). Ms. Johnson further testified that none of the Pre-Lease Grants had any effect on that analysis. (SA815-16 at 27:23-28:19; SA817 at 29:17-24). Ms. Johnson further testified that she confirmed that the Debtors had paid Appellant completely for his interests, and that such payments had been made by direct deposit to Appellant's bank account at his request. (SA827 at 39:1-10; SA849-50 at 61:19-62:7; *see also* SA782 at 5, ¶ 11). She further testified that the Debtors regularly reported their oil and gas extractions to Appellant in his check detail and to the Louisiana Department of Natural Resources and that those records were publicly available. (SA827-28 at 39:11-40:8; SA830-31 at 42:3-43:5).

14. The record reflects that Appellant did not put on any evidence regarding the payment of royalties or the calculation of his Owner Decimal. (*See, generally,* SA831-49 at 43:11-61:18). The calculation of his royalty interest was not disputed in the record, but rather was explained at length by the Debtors' witness. (SA834-40 at 46:20-52:2 (explaining that

8

additional fractional interests in the calculation of owner decimals and working interest decimals *reduce* the calculated decimal rather than *increasing* it)). Appellant did not introduce any evidence regarding mineral extractions associated with the Seamster Tract or the Debtors' payments of his royalty interest. (*See generally,* SA831-49 at 43:11-61:18).

15. On December 13, 2017, the Bankruptcy Court entered the Claim Objection Order denying Appellant's claim. (SA855-64). The Bankruptcy Court held that its Sale Order definitively answered Appellant's claims regarding the effect of the Pre-Lease Grants, the alleged termination of the Lease, and the alleged alteration of royalty rights under the Lease. (SA862). The Court further noted that the Sale Order, which has not been disturbed on appeal, was binding and dispositive of the issues Appellant raised regarding the validity of the Lease. (*Id.*) With respect to Appellant's claim of underpayment, the Bankruptcy Court concluded that the Debtors had properly calculated Appellant's Owner Decimal and had paid Appellant in full for the amounts that he was owed for "hydrocarbon extractions (gas, oil and otherwise)." (SA862-64). The Bankruptcy Court noted that Appellant had not presented any rebuttal evidence regarding the "amount of gas, oil or otherwise, extracted from the subject Wells" and did not rebut Debtors' evidence regarding his Owner Decimal or how that Owner Decimal was calculated. (*Id.*) Accordingly, the Bankruptcy Court disallowed Appellant's Claim in its entirety. (*Id.*)

16. ***Appeal of Claim Objection Order.*** Appellant filed a notice of appeal with respect to the Claim Objection Order on December 22, 2017. (B.D.I. 2978). The merits of the appeal have been fully briefed. (D.I. 12, 13, 15, 20, 21, 22, 23).

17. **Jurisdiction and Standard of Review.** The Court has appellate jurisdiction over all final orders and judgments from the Bankruptcy Court. *See* 28 U.S.C. § 158(a)(1). This Court "review[s] the bankruptcy court's legal determinations *de novo,* its factual findings for clear error and its exercise of discretion for abuse thereof." *See In re Trans World Airlines, Inc.*, 145 F.3d

9

124, 130 (3d Cir. 1998) (noting that both the Third Circuit and the district court "exercise the same standard of review") (internal quotations and citations omitted).

18. **Discussion.** While not entirely clear from the pleadings, Appellant argues that the Lease is invalid due to fraud, that the Pre-Lease Grants were fraudulently obtained, granted unconscionable benefits to the counter parties, and somehow relate to the Lease in such a way that it also was fraudulently obtained and unconscionable. (*See* D.I. 12 at 4-5). Appellant further argues that the Lease terminated through non-production prior to 1959 and alternatively that he has not been paid in full for the 1/8 royalty interest provided under the Lease. (*Id.* at 5-13). Conversely, Debtors argue that, having already litigated these issues in connection with the Sale Order, Appellant is precluded from arguing that the Pre-Lease Grants or the alleged expiration of the Lease for non-production, or any other event, invalidated the Lease. (*See* D.I. 20 at 15-20).

19. The Third Circuit has identified four general requirements for the application of collateral estoppel: "(1) the identical issue was previously adjudicated; (2) the issue was actually litigated; (3) the previous determination was necessary to the decision; and (4) the party being precluded from relitigating the issue was fully represented in the prior action." *Henglein v. Colt Indus. Op. Co.*, 260 F.3d 201, 209 (3d Cir. 2001) (quoting *Raytech Corp. v. White*, 54 F.3d 187, 190 (3d Cir. 1995)). Here, the arguments raised in opposition to the Claims Objection concerning validity of the Lease (*see* B.D.I. 321, 599) – that encumbrances on the mineral servitudes of the Seamster Tract were acquired by fraud, that those encumbrances expired, and that the Lease had not been held by production of minerals within the required time – are identical to the arguments raised in his opposition to the Sale Motion (*see* SA5-23; SA24-47; SA454-74). The record reflects these issues were actually litigated in connection with the Sale Motion and were the focus of the evidence and arguments Appellant submitted in connection therewith. It is clear that the Sale Order resolved those issues. (B.D.I. 1024, 1030). The validity of the Lease was necessarily

central to the Bankruptcy Court's determination that the Debtors could alienate and sell their interests in the Lease. Appellant's interests were fully represented as a party to the proceeding, and he was given a full and fair opportunity to litigate the validity of the Lease. That Appellant represented his own interests *pro se* does not change the analysis. *See, e.g., Eaton v. Jeff White's Auto Inc.*, 2014 WL 5780708, at *4 (D. Del. Nov. 5, 2014) (holding *pro se* plaintiff's claims were previously litigated and resolved by state court and were thus barred by collateral estoppel). Addressing these same arguments in connection with the Claim Objection, the Bankruptcy Court correctly recognized that the validity of the Lease has been decided after substantial litigation by a previous order of the Bankruptcy Court, and Appellant cannot re-litigate these arguments in this matter.[8] (*See* B.D.I. 2956 at 8).

20. Debtors argue that, even if these issues had not been adjudicated already in connection with the Sale Motion and Sale Order, Appellant's challenge to the Lease's validity is barred under Louisiana law for two reasons: 1) the prescriptive period to challenge the Lease has long since passed, and 2) Appellant voluntarily accepted benefits under the Lease, and therefore cannot challenge its validity. (*See* D.I. 20 at 20-23). The Court must agree.

21. Under Louisiana law, a party cannot challenge the validity of an agreement after accepting benefits under that agreement. *See, e.g., Mony Fin. Servs. v. Savoie*, 1990 WL 178711, at *2 (E.D. La. Nov. 8, 1990). Here, Debtors submitted uncontroverted evidence that Appellant has accepted benefits under the Lease and therefore cannot be heard to challenge it. (*See* SA827 at 39:1-10; SA849-50 at 61:19- 62:7; *see also* SA782 at 5, ¶ 11). Indeed, the Bankruptcy Court

---

[8] Appellant has continued his appeal of the Sale Order. As Debtors correctly argue, however, it is not necessary for appeal of the Sale Order to be completely resolved for issue preclusion to apply. *United States v. 5 Unlabeled Boxes*, 572 F.3d 169, 175 (3d Cir. 2009) ("[T]he pendency of an appeal does not affect the potential for *res judicata* flowing from an otherwise-valid judgment."); *see also In re Brown*, 951 F.2d 564, 569 (3d Cir.1991) ("In this case, the order of the state court granting summary judgment on liability was not final for purposes of appeal, but that does not deny it preclusive effect in the bankruptcy court.").

included this as an alternative basis for overruling Appellant's objection to the Sale Motion. "In the alternative, the Court could find . . . the fact that the beneficiaries of the Seamster lease received and continue to receive royalty payments prior to 1959 and have continued to receive them to this day, that under Louisiana law, that constitutes sufficient evidence that there's a valid lease. (SA544 at 65:13-65:19). "That is not my primary ruling. My primary ruling is factual in nature. My secondary ruling, only to the extent my primary ruling is wrong, would reach the same result. Those checks have been received, they've been cashed; as a legal matter that's sufficient to establish the lease." (*Id.* at 65:20-65:25).

22. The Bankruptcy Court also included the expiration of applicable statutes of limitations as an alternative basis for overruling Appellant's objection to the Sale Motion. (*See* SA545 at 66:1-20). In connection with this appeal, Debtors raise the same argument. Under Louisiana law, the prescription period for an action to annul a contract, including for fraud, is five years. (*See* D.I. 20 at 20 (citing LA. CODE CIV. ART. 2032); *Whitten v. Moorman*, 973 So. 2d 159, 164 (La. Ct. App. 2007) (applying 5-year prescription period for allegations of fraud in the inducement)). As the Bankruptcy Court correctly noted, the prescription period for claims contesting royalty miscalculation is three years. (*See* B.D.I. 2956 at 2 n.4). Here, the Lease was executed and recorded more than 50 years ago, and the Lease was inherited by Will Seamster's children in 1970, more than 30 years before Appellant inherited his partial interest in the Lease. The legal right to challenge the Lease for non-production or fraud was therefore prescribed long before Appellant had any interest in the Lease. The record reflects that Appellant failed to meet his burden of showing the action was not prescribed under Louisiana law. *See Carter v. Haygood*, 892 So.2d 1261, 1267 (La. 2005) ("[I]f prescription is evident on the fact of the pleadings, the burden shifts to the plaintiff to show the action is not prescribed.")

12

23. Appellant's remaining arguments are also unavailing. Although Appellant did not provide any documentation in support of his Claim (*see* SA1-4), Appellant again argues that he has been underpaid for his interest in the Lease. (*See* D.I. 12 at 4). The record reflects that Debtors introduced voluminous evidence concerning the calculation of Appellants' royalty interest and the payments that have been made to him.[9] Appellant did not challenge the Debtors' calculation of his mineral royalty interest under the Lease or introduce any evidence relating to the Debtors' calculation of that interest. Likewise, Appellant did not introduce any evidence regarding the Debtors' production of minerals or the payments that he received from the Debtors on account of that production. Accordingly, Appellant cannot prevail on his claim of underpayment as there is no evidentiary basis for the Court to rule in his favor.

24. Appellant also argues that Will Seamster somehow lacked mental capacity to enter into the Lease and cites *Succession of Molaison,* 34 So.2d 897 (La. 1948), in support of his proposition that courts can undo a contract entered into between parties where one party is of "limited mental capacity and one [is] experienced in business affairs." (*See* D.I. 5 at 2; D.I. 12 at 1, 6-7). In response, Debtors cite cases demonstrating that the *Molaison* decision has been widely criticized and distinguished and further argue that the case is factually distinguishable. (*See* D.I. 20 at 27-28). Debtors also point out that Appellant has provided no authority to support the proposition that the holding in *Molaison* would overcome Louisiana's prescriptive statutory period. (*See id.*). Debtors argue that even if the Court applied *Molaison*'s holding, Appellant still would not prevail because he has not shown that Will Seamster fits the narrow category of people that the Louisiana court sought to protect in that case – *i.e.*, a person of limited mental capacity.

---

[9] Debtors introduced evidence demonstrating: (i) the derivation and calculation of Appellant's partial royalty interest (*see, e.g.* SA781 at 4, ¶ 7); SA601-6; SA825-26 at 37:13-38:18); (ii) the volume and type of minerals extracted from the Seamster Tract (SA685-88,711-77 at Exhs. M-1, N); and (iii) the payments made to Appellant on account of those mineral extractions (*id.* at SA711-77, Exh. N; SA782; SA826-27 at 38:16-39:10).

13

(*See id.* at 28). The Court agrees with Debtors. Appellant argues that Will Seamster had no formal education, a submission allegedly supported by U.S. census data (*id.*; D.I. 13 at 2), but offers nothing in support of his assertion that Will Seamster lacked mental capacity. Even construed liberally, Appellant does not allege that his great-grandfather was mentally disabled, nor did he introduce any evidence that could support such a finding.

25. Appellant's overall argument is that his Claim should be allowed because the Lease was obtained by fraud or that it otherwise is unconscionable, but Appellant adduced no evidence to support these assertions. (*See* D.I. 10-11). Debtors, on the other hand, put on testimony to establish that the royalty rate set under the Lease was standard for such leases and that its terms were otherwise ordinary. (*See* SA811-12 at 23:5-24:18). None of the documents that Appellant cites and relies upon altered the mineral royalty granted under the Lease or the calculation of Appellant's inherited percentage of that mineral royalty.

26. **Conclusion.** Debtors submitted unrebutted testimonial and documentary evidence that Appellant had been paid in full for his proportional interest under the Lease. Appellant failed to adduce evidence sufficient to establish his Claim. Accordingly, the Bankruptcy Court did not clearly err in holding that Appellant had been paid in full for his interests and did not have a claim against the Debtors. A separate order shall be entered.

Entered this 27 day of September, 2018.

*/s/ Richard G. Andrews*
United States District Judge